Yeah, it's terrible. Somebody blowing into the mics. If I turn my completely down. Can you turn yours down all the way? I did. I did. I did. And then Will it record the arguments nonetheless? I understand Mr. Council for Mr. Ryder is going to present his argument from council table. May it please the court. I'm here. Robert Cockcroft speaking on behalf of Planets and thank you to interveners for also allowing me to have a time slot to cover their recent case that we just had come down in Louisiana on the Saldana case. I've kind of abandoned my briefing in terms of how to proceed. I will touch only lightly on the the dangerous trap doctrine. It's a vestige of contrived still think it needs to go away. But in reality, given the Saldana case, I believe it's probably not a necessary component of the argument today. We would still like to see the court. Save us treat this duty like any other duty and do away with the construct of an old contrived hurdle that get through to get to duty under contrived. Normally as a as a federal court in diversity, we wouldn't make that kind of giant leap and make some general declaration about Louisiana law that would sort of turn things upside down. I recognize that and that's why and there are cases since contrived was abandoned and replaced with with comparative that actually still talk about the dangerous trap. So that's why I don't want to spend a lot of time on it. It's just not it's not germane to what we have under the assumption of the duty argument and that's what I'd like to focus my attention and actually follow the request of the court to be prepared to discuss the Saldana case. What I did is I went through Saldana and took all the points that were made in that case and thought it would probably be helpful to give you places in the record where that identical issue is addressed in our case. The first of which this is a difference between our case and Saldana. In this case, the Union Pacific admits that they put up the stop signs. That was a question of fact in Saldana. In Saldana, didn't the court say that that by putting up the signs that that that means that the owner takes on a general duty to warn? Correct. Adopts that duty. If you're going to put up a warning sign and and take the responsibility warning, you have the duty to do it right. So the two reference places where that is in the record is record on appeal 3365 and page 6 of Apolli's brief. We've given references. The second and very important issue is in our case, the railroad in essence admits that these stop signs were put up in 2012 as a response to a prior accident and a prior near-miss to improve safety and the prior near-miss was with an oil-filled truck. Contemporaneously, they internally designated this crossing as a private crossing with public characteristics, which means they recognize this crossing needs more. Now, the reference in the record to that is record on appeal 3361 and it's the same designee as that call. The third issue, and there was some debate in Sardinia, but Union Pacific here admits those are warning devices. So the question on if you're if you think you're making a warning for somebody, you've adopted the duty or assumed the duty of doing the warning the right way. Well, here we're not going to have that argument. Well, it wasn't really a warning. It was kind of a you probably ought to look at it type of thing. It's a warning device sign out of the MUTCD, so exactly. And just to make it totally clear, that's in the record on appeal 145, which in Union Pacific's answer is actually paragraph 90, where they acknowledge those are warning devices they put up. And in our case, there's no question we pled the assumption of this duty by the railroad when they put up those signs. That is at record on appeal 49 through 50 in our complaint. And I'm going to get through this drab part as fast as I can, but the argument follows then that, well, it didn't make any difference. That's kind of what the railroad says is these signs are signs, but they didn't cause the accident. Well, we have made a very extensive record on what the United States Department of Transportation knows about stop signs versus active warning devices and other warning devices, and how those apply to this process. Concerning the studies by the U.S. DOT, the record on appeal contains that study, and it's at 3352 through 3364. The study, in essence, says the least effective thing you can do at a grade crossing is put up a stop sign. You take all the things that you can do there, and you put up a stop sign, the accident rates there are the highest. Railroad actually acknowledges that in their response. That's what this study says. The other thing is that, and this is a real interesting concept, the DOT started funding lights and gates at public crossings back in the 70s, and those funding requirements were go look at your crossings, find the dangerous ones, do an engineering study, and put up the effective warning devices. Primarily that became lights and gates, active warning devices. So the study shows the graph that the public crossings since the 70s, the accident rates have plummeted, and they're just almost to the bottom. At the same time, same time period, it's flat lined. There's been no improvement in the private crossings accident rates. Over a long period of time with literally hundreds of millions, if not billions of dollars being spent. Let me just say this. The court didn't rule, did the court rule on this insufficient warning, insufficient carrying out of the duty, voluntary duty to warn? No. It was actually the court. So you're asking us to rule on appeal that the case should go forward on that basis? Right. On that, what the court did is simply said your claims are gone, and didn't discuss the issue of assumption of a duty and whether or not they properly exercised that duty once they assumed it. So we have a basically a barren record. We don't know what happened in those studies. Once we got those in the record, we had discovery battles back and forth. And the railroad then raised the issue that, yeah, those are the statistics, but they don't apply to this crossing. That's where I need to point out that the biggest issue at a grade crossing in terms of safety at a private crossing like this is the issue of you not being able to hear a train horn in a number of different circumstances. Almost all of us, before we are introduced to the science of audiology or been involved in an accident where this happens, believe that's crazy talk that you can't hear a train horn. I can lay in bed at night and hear a train two miles away. Of course, that's in an ambient noise level of zero, darn it. Are you saying it was because of the noise from the oil field equipment? Multiple things. Really foggy. The oil, all of that natural gas facility noises had a masking effect. But then the big thing, one of the many big things, is there's a couple of people sitting there idling, and they're work trucks, so they weren't quiet. They're big diesel engines. And that's why- Are you talking about the truck engines stopped? Yeah, the engines on the trucks that were stopped, they're idling. That's why the guys that were, even the guy that's outside trying to open the gate doesn't hear the train coming. We know the train horn blew. We've acknowledged it blew. We admit it blew. The video shows it blew. You admit what? That the train horn blew. They blew the horn for a long enough period of time that the crew didn't do anything wrong. The problem is, the reality of audiology, there are so many different combinations of circumstances that can prevent an alert motorist from hearing a train horn. And just to give you an example, if you've ever been at the kitchen sink, and you've got the water running, and somebody's trying to talk to you- Let me ask you, assuming what you say is correct, what evidentiary support would you have for the idea that they didn't have, that that had a causal connection to the accident? Well, the three eyewitnesses indicated they- No, but they could- I admit it, I agree. I mean, the picture shows it was a bit of a gray day. But apparently, they had 300 yards visibility of the train. Is that right? The trees were 100 yards away, and the train was 300 yards? That's visibility. Right. Now, and the two components is, yes, at some point, you would see that train. That's several seconds of visibility, and no seconds of, hey, look down here. So I'm not suggesting that the driver's false. This is a pure comparative state, and the driver will get some comparative for that. The reality is, train horns are supposed to be blown for a minimum of 15 seconds by federal law, and if you told me 15 seconds before I was going to get hit by a train, I'd be off that crossing. So that is a huge causal relationship. I thought you said they blew the horn appropriately, if for the appropriate length of time. They did. And that would be 15 seconds minimum. So had that been audible at the crossing, then the warning would have been 15 seconds, not just a few. And the other way to look at that is, the effectiveness of lights and gates, well-documented, it's in our studies, they are 95% effective at preventing accidents at crossings that had no active warnings before. Are you saying lights and bars, crossbars need to be at every, gates need to be at every private crossing? Absolutely not. Some active warning devices can be as simple as when you pull into a parking garage, there's just a gate there. You hit a button, and it'll let you go if it's clear. When you hit that button, it just checks. I mean, there's very low-cost audible warning devices. Australia, decades ago, I went over and participated in a study where they put up low-cost active warning devices through the outback because they couldn't afford full tilt. And they were doing it for like $10,000 instead of $150. I'll bet you they don't put them up everywhere in the outback. Not everywhere, no. They put them up, actually, their goal was to put them up in places where they knew seasonally they were going to have this onslaught of trucks which is basically bringing product to market because that was the impetus for their study. So. What is the effect, if any, on this case, the circumstance of the locked gate located fairly short distance from the track? In terms of the duty, whatever the duty may have been on the landowner? I think it's important for a couple reasons. That was one of those locks where the landowner had a key, the workers that were authorized would get keys, the railroad would have a key, and they all had their different locks. So you've got this chain of locks and we open ours and we get in and out. It increases the amount of time on the crossing tremendously. You don't just get to drive up and go in. The other thing that I think makes it important is. Well, you don't have to stop on the tracks when you're waiting in line or. No. And that's absolutely true. There will be fault distributed to the driver. I don't have any questions about that. And that appropriately so. The other issue is. It's a group of identifiable people that are in the group that is. When the stop signs were put up. It's that group of authorized users that the stop signs went up for. Some of the other alternatives were available at the time they made this decision. It was very simple. What they do at other crossings. Call ahead. Make sure there's a flagger. Flagger is an individual, right? Correct. You're out in a sort of rural area, aren't you? Not too. I mean, no more than most of Louisiana. There was a cattle guard there. That means it was some. Yeah, there is a cattle guard. And it's, you know, it's. Versus urban. Absolutely. It's it's not an urban area. It's rural. But it's. Pasture wherever the wells were located. We only focused on that part that had the corner with the facility. Because there were literally hundreds of other acres of. I just wondered because. References to this being some kind of subdivision. I thought subdivision of what? 10,000 acre ranch or what? Well, and that's why I was telling you when you said rural. There are those, you know, not all subdivisions are planned unit development to get approval from a board. It's one of those. I'm going to turn my 60 acres into 20 homes. And so there is that type of of dynamic around this area. I want to. Exceed your time. Okay. Time for a bottle. All right. Thank you. Chief Judge Owen, may it please the court. The Saldana case is indeed instructive on the assumed duty case. Because what it holds is that when a defendant commits to providing signs. It has a duty to provide the signs in a non negligent manner. Which is what your opposing counsel just told us. And that is exactly what we did here. Union Pacific voluntarily committed to install a stop sign at this crossing even though there was no statute requiring one. And there is no evidence whatsoever that there is a single thing wrong with this stop sign. It's installed correctly. It's. Well, that wasn't the issue in Saldana either. I took three things away from that. One, whether there's a duty is a fact question. That seems pretty clear. Two, whether the duty was breached is a fact question. And it doesn't have to be a defective sign. Just not enough of them or they didn't give enough information or they weren't effective. That's a fact question. In Saldana, there were lots of fact questions. Whether the signs were installed at all. Whether they were. The wife agreed to it. The guy said he went out there and put them up. They were his. And there were people. There were photographs where the signs. Well, but they were there. Okay. The question, were they effective? Right. Whereas here, there's no question that there was one stop sign. The typical stop sign. It's in the record excerpt. I'm sorry? The photo of it is in the record excerpt. Right. Yes, yes, yes. The question is, should they have done something more than a stop sign? And Saldana seems to say that's a fact question. What Saldana is saying, Saldana refers to duty under the Louisiana duty risk analysis being an issue of law. Which, of course, cannot be decided in a vacuum. That there can be fact disputes that have to be resolved before the question of whether a duty arises can be resolved. And certainly in Saldana, because no one could agree what actually happened on the night in question and what warning devices were in place, you do have to resolve fact issues. The court did have to resolve fact issues in Saldana in order to determine whether there was a duty there that was breached. But here, I would submit that I don't know what the fact issue would be for a jury to determine. The reasonableness of the warning, I thought Saldana said, once it's determined that they did undertake to provide a warning and that they therefore have a duty, then there's another fact question about whether the warning that was provided was in and of itself reasonable. But that's not- Isn't that what it says? Saldana does not talk about any warning devices other than signs. And so yes, there were questions, reasonableness questions involving signs. But they're limited to signs because there was no evidence that the contractor had a practice or might have put out some other type of warning device. And so Saldana is consistent with Carr and other Louisiana cases saying that under the assumed duty doctrine, that means, and this is a quote from a Louisiana Supreme Court case called Buhol versus Energy from 2014. It means persons who voluntarily assume certain duties must perform those duties in a reasonable and prudent manner. Not that they expand and take on a much larger duty. Although the scope of the duty here is the duty to warn. The scope of the duty here that Union Pacific assumed is to warn in a particular way by installing a stop sign. Well, I mean, what's your best case for saying that your duty to warn does not extend beyond signs? I think, and I just want to make one nuance here, that this court's been applying the Erie Doctrine unless a Louisiana court has gone and done that. I don't think it would be appropriate for this court to expand it. And so my answer is that Louisiana courts have never, to my knowledge, throughout the entire history of the assumed duty doctrine, said that by taking one type of act, the defendant assumed a broader duty generally. And so in the railroad context, for example, in the Carr case, C-A-R-R, the railroad undertook a duty to maintain the asphalt at a crossing. And the question there was, did the railroad, although it had no duty to do it in the first place, it had an assumed duty not to put so much asphalt that it would create a hump in the crossing that a vehicle could get caught on. So it's the thing that the railroad did that it has to. So what, excuse me, but what you're saying then is when Mr. Popchoff says that in lieu of the signs, they could have put up a flaggers or is a cross buck those bars that come down? Is that what? The cross buck, Your Honor, is the X. There's no moving parts. It's the two slats that form an X on the pole. Black and white. The black and white crossing. Correct. Correct. All right. So those are passive warning devices, which are found at the vast majority of private crossings. Private crossings can have nothing at all under Louisiana law. No warning whatsoever. Most often, the railroad voluntarily puts up some sort of signage. It's an extremely rare case that a railroad would install lights and gates at a crossing. And saying there's no Louisiana law that would require that. No. And I would point to a Louisiana case, which I think is similar and also raises some policy concerns that are relevant. Johnson versus Lloyds of London, which is 653 Southern 2nd 226, which is a decision from the Louisiana Court of Appeals. And there, the issue involved a landowner who had no liability under the Louisiana recreational use statute. And the plaintiff's contention in that case was, well, the landowner put up a big warning sign and said, be careful of this particular hazard. And so the argument was, is that assuming a duty to provide warnings and make the area of nature safe for people who use that land? And the court, one of the considerations that was relevant to the court in not holding that the landowner had assumed such a broad duty, was to say that if the landowner has liability under the recreational use statutes for negligent undertakings like a sign, that is going to have the perverse effect of discouraging landowners from undertaking these things. And that's a very relevant concern here. And I have to disagree with Mr. Potroff a little bit about these low-cost warning devices that even though a light may appear to be inexpensive, you have to have circuitry in the tracks that can detect when a train is coming and when it's really a train and not something else, and how fast it's coming, that it is very expensive to do that. And Union Pacific has many private crossings. There are more than 2,300 private crossings in the state of Louisiana at all. It is simply not feasible to install active warnings with lights and train detection at these crossings. And on the other side of the equation, it's very clear in Louisiana that there's no duty to install any sign at all. So the railroad would be put in a very, very tough place if simply posting the signs that railroads voluntarily post all the time were suddenly to open them wide open to liability at these 2,300 private crossings. What do we do with Saldana? Because as I understand the facts, the person who was injured or killed was getting ready to pass a logging truck as it was getting ready to turn left without any brake lights or a left turn signal. And she hit the truck when it was turning. And then she went off in the ditch and hit another truck that was parked perpendicular. So the signs, I don't understand how the signs that were there that said this is a logging truck crossing, they said there was still a fact question about whether they were adequate. They were basically saying that once you put up that kind of sign, you have to do more. That seems to me what Saldana says. I think and I'm unclear from the opinion exactly how the signage was supposed to work if it were not negligent in Saldana. But what I can say is that here there's no fact question because this issue did come up in the district court. It was part of the summary judgment motion and the district court ruled on it. And there is zero evidence in this record that the single perfectly functional stop sign placed at this crossing was careless or negligent in any way. And certainly no evidence that it makes the crossing more dangerous. And I think I'm hearing the opposite. Didn't the lady in Saldana's, I thought she was alive, right? I think she said that if the sign had been bigger, it wouldn't have caused, she wouldn't have had an accident. And there is no such evidence like this. There's no evidence that the stop sign, that the issue was that this driver failed to notice the stop sign because it was not bright enough or too small or anything like that. There's simply no evidence in the record whatsoever. The evidence was that they all knew the stop sign was there. They'd been to this crossing earlier that day. The problem was until, as unfortunately the video tells us in the train crew testimony, is that he simply did not know that there was a train there until a split second before the accident. And I do want to be clear that plaintiffs have mentioned some studies in their Federal Railroad Administration Department of Transportation Studies, which certainly they do excellent, excellent research, which is why I want to address that. They do have a chart in their brief that shows that the greatest percentage of accidents at railroad crossing occur at crossings where there is a stop sign. The problem is that they're taking that a step further to try to show causation where none exists. So you could say 99% of car crashes happen on paved roads and only 1% happen on unpaved roads. You can't then leap to the conclusion that paving a road makes it 99 times more dangerous. And that's, in effect, what they're trying to do when they try to suggest that so many accidents happen at private crossings with stop signs that there must be something negligent about installing a stop sign. Well, all it says is they are less effective than other means of warning. And certainly I think that is true. And the reality is that it is not possible to install active warnings at every public crossing in the United States, much less to start installing them routinely at private crossings, many of which are rarely used, that it would be a terribly inefficient use. But their argument is this is not rarely used, that this is used frequently by large trucks that are noisy and that UPRC knew it. They are making that argument. Under Louisiana law, which I think plaintiffs are no longer challenging, though, the duty to install lights and gates arises only when the crossing is a dangerous trap. That is clear in the Davis case decided by the Louisiana Supreme Court in 2014, which we cited in our summary judgment motions. In the district court, we cited extensively in our brief in this court. Plaintiffs and interveners have now filed three briefs in this court in which they failed to cite the Davis case at all. And Davis says clear as a bell that if there is no statutory duty under Louisiana law and the sight distances are such that there is no need for a driver to put himself or herself in a position of peril before they're able to see a train, then there are no further duties based on things like traffic counts or noise at the crossing or a history of accidents or that type of thing. And just to be clear on the summary judgment record, there may have been a question on this. The district court did specifically find that the issue was whether by installing the stop sign, Union Pacific assumed the duty to provide the appropriate warning device and did so negligently by installing the incorrect device. So that was before the district court and that issue is fully before this court. How does Davis intersect with the Duncan case? So Davis is not a long opinion but it's a very, very clear opinion in that you had a crossing with a cross buck sign but no active warning devices. The trial court granted a summary judgment on one ground only saying the sight distances were and the crossing was not a dangerous trap, end of story. The court of appeals reversed that summary judgment saying, well what about all these other factors? There were parallel roads, there was a double railroad track at that crossing, there was a hump that vehicles had to pass over, there were high traffic volume, there were prior accidents and so the court of appeals said, well surely all of this raises a fact issue and what the Louisiana Supreme Court said very clearly is no in a short opinion it said the railroad satisfied its statutory duties in this case and quote the only remaining issue was for the district court to determine whether the defendants owed a duty to warn roadway users that this crossing constituted a dangerous trap. Could not be more clear, there is a long line in fact of Louisiana cases going back to at least the Gleason case from 1964. This court indeed has recognized that principle in the Alfaro Court from the Eastern District of Louisiana which this court not only affirmed but issued an opinion adopting in full the reasoning of the district court. And so in the middle of this you have Duncan. Duncan to me is 98% I understand every word and then there is one puzzling sentence in Duncan that says based on an expert report the jury could have concluded that the railroad has a duty to protect against unique hazards at the crossing. It then moved on from that subject, it talked extensively about sight distances and how the plaintiff could see a train coming before they had to put themselves in position of peril which of course is the dangerous trap doctrine. Two things about Duncan, first of all the Louisiana Supreme Court certainly did not say anything to indicate it was changing Louisiana law and saying that you can establish common law duty on any basis other than the dangerous trap doctrine. And second of all, even if Duncan had changed the law in 2010, the fact is Louisiana Supreme Court changed it back again with the crystal clear Davis opinion four years later in 2014. So address what Mr. Putroff said about the inaudible horn. What's your response? The horn claims are preempted by federal law and what federal law requires is not that a particular person hear the horn, federal law requires that the locomotive horn be blown at a volume that's within a certain range which is between 96 and 119 decibels. The proof, the summary judgment proof conclusively established that Union Pacific complied with this federal regulatory duty and by sounding the horn it was roughly 99 decibels which is certainly loud enough to satisfy the federal regulation. And because this federal regulation covers the subject matter of the horn audibility, then any cause of action under state law challenging horn audibility is preempted under 49 U.S.C. 20106 of the Federal Railroad Safety Act. And that's what the district courts held in this case. The argument that Mr. Putroff has made is that there are some witnesses who said in their statements they didn't notice the horn, you know, when the train was very far away. First, the witnesses, if you look at the testimony, they're not saying that the horn wasn't audible, they're saying they didn't happen to notice the horn. It's not like they were standing there trying to hear a horn and could not detect a horn. But also this court has been very clear again in the Alfaro case that I mentioned from the Eastern District that was adopted in full that when the railroad establishes through an audiologist's tests what the actual volume of the train horn was and it's within the federal range, a plaintiff cannot create a fact issue by just having someone say I didn't hear the horn until the train was pretty close. And that's the law not just in this circuit but around the country as well. Your time has expired. We have your argument canceled. Thank you. I know I won't have time to finish the mischaracterizations but I'm going to try. Train horn audibility, the only thing that's preempted is how they build their horns. There is nothing anywhere in any case that suggests the ability of a motorist to hear a horn that somehow vanishes from the case because they built it according to federal standards. We're not arguing they didn't build a good horn. In fact, I admitted the horn was sounded in such fashion and it's a loud enough horn that it's okay, it meets the standards. If it's any louder, it's going to blow neighborhoods away. What we're saying is given the fact that horns that are in use aren't audible in certain circumstances, that's a problem that needs to be addressed with active warnings. And the suggestion that three people on a railroad track, knowing that they're on a railroad track, didn't hear a train horn because they weren't paying attention, granted I know what they're trying to do but that sure doesn't establish as a matter of fact that everybody should have heard the horn. That's a question of fact. Is the horn audible? To make sure that you. So given the facts of this case, the layout of the accident scene, what is it that Union Pacific did not do in advance that it should have done? They should have had any form of audible warning that met the federal standards on audible warnings, which is a minimum of 20 seconds warning. Now. Well, I mean, what would those normally be? It could be just a flasher. Just a normal flasher with a bell. When I wait, you're, I'm sorry, you're mixing audible warnings with active warnings. You said active warnings and then you said audible warnings. Well, the bell, there is an audible warning on the active warning devices. They recognize that you can't hear train horns when they put up audible warning devices and include a bell right there at the crossing. So you're talking about a gate with lights, right? No, any, it can be, it can be a flasher. It can be that little gate I'm talking about. There's an endless supply of low cost active warning devices that would have an audible and visible warning to a motorist at a crossing. What's your best case for saying that's required in Louisiana law and not an extension of Louisiana law? Frankly, the Saldana case confirms all of the authorities we had in our brief. Louisiana law has required from the get go, if you take on a duty, do it right. Now I'm going to quickly run through these others because I want you to see these things. In the record on appeal, I have an audiologist report that sets us all out. And by the way, the Duncan Casey sites in Louisiana recognizes that our audiologist report should be considered. It's from Dr. Seidman. The record on appeal number is 3828 to 3838. The other place, no, that's a three, yeah, that's that report. The three eyewitnesses are 3385 to 3386. And finally, the misquote about me talking about gross numbers of accidents is wrong. It's accident rates and the U.S. Department of Transportation not only says it's accident rates, but it also identifies that's why stop signs are ineffective. The suggestion that there's no factual issues around what's the right warning device, I would presume the court files here have hundreds of public crossing cases where somebody got hit at a grade crossing. Ninety percent of those will be replete with all the factual disputes over what's the right warning device. That's the core of most crossing litigation. I don't, I didn't understand that we could somehow escape our duty by saying a contractor went out. The contractor was simply installing signs according to the instructions of the Union Pacific Railroad. The other suggestion that we don't have many of these is just flat wrong. Union Pacific Railroad has a CAPS program, C-A-P-S program, where they install lights and gates at some industrial crossings or require the landowner to put some approved active warning device there. And we've cited many of those in our briefing that there are a number of locations in Louisiana with active warning devices. That's just factually incorrect for them to suggest they don't do that. The. Council, your time has expired. I know, but thank you so much. Thank you. That will conclude the arguments.